JACK P. DICANIO (SBN 138782)
Jack.DiCanio@skadden.com
JAMES P. SCHAEFER (SBN 250417)
James.Schaefer@skadden.com
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
525 University Avenue, Suite 1400
Palo Alto, California 94301
Telephone:  (650) 470-4500
Facsimile:   (650) 470-4570

ABRAHAM A. TABAIE (SBN 260727)
Abraham.Tabaie@skadden.com
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
300 South Grand Avenue, Suite 3400
Los Angeles, California 90071-3144
Telephone:  (213) 687-5000
Facsimile:   (213) 687-5600

Attorneys for Plaintiff Criteo S.A.

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CRITEO S.A., <br><br> Plaintiff, <br><br> v. <br><br> STEEL HOUSE, INC., <br><br> Defendant. | CASE NO.: 2:16-cv-4207 <br><br> CRITEO S.A.'S COMPLAINT FOR: <br><br> (1)  Federal False and/or Misleading Advertising; <br> (2)  Fraud; <br> (3)  Intentional Interference With Prospective Economic Advantage; <br> (4)  Libel; <br> (5)  Trade Libel; <br> (6)  Unfair Competition (Cal. Bus. & Prof. Code § 17200 *et seq.*); and <br> (7)  False Advertising (Cal. Bus. & Prof. Code § 17500 *et seq.*) <br><br> <u>DEMAND FOR JURY TRIAL</u> <br><br> Complaint Filed:  June 13, 2016 |

CRITEO S.A.'S COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

Plaintiff Criteo S.A. ("Criteo") files this Complaint against Defendant Steel House, Inc. d/b/a SteelHouse ("SteelHouse"), and alleges, upon personal knowledge with respect to itself and its own acts, and upon information and belief as to all other matters, as follows:

## NATURE OF THE ACTION

1.     This case is about a new click fraud scheme hatched by SteelHouse—a performance-based online marketing vendor—to steal credit for online sales attributable to its competitors and partners, and to wrongfully take credit for direct traffic attribution (*i.e.*, sales to internet shoppers who reached the e-tailer's website by typing the e-tailer's web address into their web browsers, not by clicking on an online advertisement placed by SteelHouse).

2.     Since at least May 2015, SteelHouse has counterfeited clicks to trick e-tailers into attributing sales to SteelHouse that should have been attributed to Criteo, other competitors and partners, or direct traffic.

3.     By stealing credit for sales attributable to Criteo and other competitors and taking credit for sales attributable to direct traffic, SteelHouse artificially inflated and continues to artificially inflate key metrics of its performance, including its conversion rate (*i.e.*, the percent of clicks attributed to SteelHouse that resulted in a sale by the e-tailer) and the return on ad spend ("ROAS") of its e-tail clients.

4.     By stealing credit for sales attributable to Criteo and other competitors, SteelHouse also artificially suppressed and continues to suppress the conversion rates of Criteo and other competitors and the ROAS of their respective e-tail clients.

5.     SteelHouse exploited its manipulation of these key performance metrics by falsely advertising that it consistently outperformed Criteo in head-to-head comparisons in order to divert business to SteelHouse that otherwise would have gone to Criteo.

6.     Criteo confronted SteelHouse when it discovered SteelHouse's counterfeit click fraud scheme.  SteelHouse initially denied knowing of the fraud,

CRITEO S.A.'S COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

1  and asked for time to investigate.  SteelHouse subsequently stated that it would

2  "remove the behavior" and claimed that it was working on code that would do so.  In

3  fact, SteelHouse was working on code intended to make its counterfeit click fraud

4  more difficult to detect.  SteelHouse also sought to make its counterfeit click fraud

5  more difficult to detect by both decreasing the volume of counterfeit clicks that

6  followed valid clicks on Criteo-placed advertisements and increasing the volume of

7  counterfeit clicks that followed direct traffic.

8      7.      SteelHouse's—or, more accurately, StealHouse's—counterfeit click

9  fraud has irreparably harmed and continues to irreparably harm both Criteo and the

10 online advertising industry as a whole.  Accordingly, in addition to millions of

11 dollars in actual damages, punitive damages, and attorneys' fees, Criteo seeks

12 preliminary and permanent injunctions prohibiting SteelHouse from:

13 (a) counterfeiting clicks; (b) interfering with, or manipulating, by any means, the

14 proper attribution of online sales; (c) engaging in any other conduct designed to

15 artificially inflate or artificially suppress performance metrics; and (d) falsely

16 advertising that it consistently beats Criteo in head-to-head comparisons.

## PARTIES

18     8.      Criteo is incorporated as a société anonyme under the laws of the

19 French Republic, and its principal place of business is located at 32 rue Blanche,

20 75009 Paris, France.

21     9.      SteelHouse is a Delaware corporation, and its principal place of

22 business is located at 3644 Eastham Drive, Culver City, CA 90232.

## JURISDICTION AND VENUE

24     10.     The Court has jurisdiction over this action under 28 U.S.C. §§ 1331 and

25 1367.

26     11.     This Court also has jurisdiction under 28 U.S.C. § 1332(a)(2) because

27 Criteo is a citizen or subject of a foreign state and SteelHouse is a citizen of

28 Delaware and California, and the matter in controversy exceeds the sum of $75,000,

2

CRITEO S.A.'S COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

1  exclusive of interest and costs.

2       12.    Venue is proper in this District under 28 U.S.C. § 1391(b) because

3  SteelHouse is a resident of this District and a substantial part of the events giving rise

4  to the claims alleged herein occurred in this District.

5  **STATEMENT OF FACTS**

6  **Performance-Based Online Marketing**

7       13.    Performance-based online marketing works because e-tailers can track

8  the source of traffic to their websites and attribute subsequent sales to the marketing

9  vendor responsible for that traffic.

10       14.    Because e-tailers often contract with multiple marketing vendors at the

11  same time, they need a means to track which marketing vendor placed the

12  advertisement clicked on by the potential customer.  This is accomplished by adding

13  tracking codes to the Uniform Resource Locators ("URL") used to take potential

14  customers who click on an online advertisement to the e-tailers' websites.  A URL is

15  an address on the internet, such as http://www.example.com, which enables

16  computers and other devices to visit it.  The bolded code in the following example is

17  a tracking code: http://www.example.com/home.html?**utm_source=SteelHouse_x**&

18  utm_ medium=display.

19       15.    To determine which marketing vendor should receive attribution, or

20  "credit," for a sale when an internet shopper has clicked on advertisements placed by

21  more than one marketing vendor before the sale, e-tailers use various attribution

22  models.  An "attribution model" is a rule, or set of rules, that determines when a

23  marketing vendor or direct traffic receives credit for a purchase made by an internet

24  shopper.  Credit is allocated either to direct traffic activity or to a marketing vendor

25  when the shopper reached the e-tailer's website by clicking on an ad placed by that

26  marketing vendor.

27       16.    The majority of e-tailers use Last-Click Attribution to attribute credit to

28  the corresponding source of traffic (*e.g.*, search engines, direct traffic, online ads)

3

and to assign credit among competing marketing vendors.

17.     Last-Click Attribution is a web analytics model in which the source of the "last click" before a sale is given credit for the sale.  Web analytics systems such as Google Analytics™, Adobe® Analytics, and IBM® Coremetrics®, among others, can track and measure attribution and marketing vendor performance in this manner.

### Retargeting

18.     Retargeting—a form of performance-based online marketing—is a cookie-based technology that allows marketing vendors to serve ads targeted to potential customers based on their past browsing history as they browse the internet. Retargeting works as follows:  When a potential customer visits an e-tailer's website, a cookie is dropped on the potential customer's web browser that indicates he or she visited the e-tailer's website.  Later, when the potential customer browses the internet, publishers of other websites see the cookie and, if they have advertising space available, offer the associated e-tailer's marketing vendors the opportunity to purchase that advertising space.  If the marketing vendor determines that the price of the advertising space affords it the opportunity to make a profit, it purchases the space and serves a targeted advertisement for the associated e-tailer.  Retargeting is effective because it focuses the e-tailer's advertising spend on people who have already demonstrated an interest in the e-tailer's products or services by visiting the e-tailer's website.

19.     As is the case with most marketing vendors, Criteo uses a Pay-Per-Click, also called Cost-Per-Click (CPC), pricing model.  Under this model, Criteo only generates revenue when internet shoppers click on the advertisements that Criteo places for its clients.

20.     The amount that Criteo can charge its clients per click depends on its performance, as measured by its conversion rate and the ROAS of its clients.  Both Criteo's conversion rate and the ROAS of its clients depend, in large part, on the proper attribution of sales to Criteo.

CRITEO S.A.'S COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

## Criteo And SteelHouse Are Direct Competitors

21.     The market for performance-based online marketing is highly competitive, complex, and fragmented.  Criteo's competitors include, among others, Google, Facebook, AdRoll, Sociomantic, and SteelHouse.

22.     Criteo competes directly with SteelHouse for retargeting business.

23.     Every day Criteo is presented with billions of opportunities to connect individuals that are browsing the internet with relevant marketing messages from Criteo's clients.  For each of these opportunities, Criteo's algorithms analyze massive volumes of data to observe and predict user intent and deliver specific messaging for products or services that are likely to engage that particular user and result in a sale for Criteo's clients.  Last year, Criteo delivered targeted advertisements that generated billions of clicks.  Based on these clicks, Criteo's clients generated approximately $21 billion in post-click sales.

24.     Criteo's ability to earn the business of prospective clients and keep the business of existing clients is directly related to its performance, as measured by its conversion rate and the ROAS of its clients.

25.     Rather than compete fairly with Criteo, SteelHouse has relied on counterfeit clicks and fraudulent advertising behavior to trick e-tailers and generate revenue.

26.     SteelHouse advertises that its products and services are superior to its competitors, and that it "create[s] performance marketing that actually performs."

27.     SteelHouse repeatedly touts that it consistently beats Criteo and other competitors in head-to-head comparisons.  For example, SteelHouse has sent potential customers advertisements stating:

> While browsing, I noticed you are using Criteo as your retargeting solution.  Did you know that we consistently test ahead of Criteo in performance?  Unlike Criteo, we are performance based; Unless we are meeting you [sic] ROAS / ROI requirements, we will not spend your money.  As you already know, Criteo will deplete your budget regardless of performance.

5

In fact, we just beat Criteo for Zappos after a head-to-head performance test.

I wanted to pass along a blog post that mentions how SteelHouse was able to accelerate its YOY growth by 100% in 2014: SteelHouse Blog.

There are no contracts at SteelHouse. Our partnership is performance based. The reason we were able to onboard such a large number of clients last year, including Staples, Zappos, Beach Body, Callaway Golf, Toms and hundreds of others, is because we out-performed our competitors in head-to-head tests. These led to lucrative, long-term relationships.

28. SteelHouse's claims are false and misleading. SteelHouse did not beat or outperform Criteo in head-to-head comparisons. SteelHouse used counterfeit clicks to cheat during head-to-head comparisons.

29. Additionally, SteelHouse's advertisements are also false because there was never a head-to-head comparison between Criteo and SteelHouse for Zappos. In fact, Zappos remains a long-term and satisfied client of Criteo.

## Criteo Uncovers SteelHouse's Unlawful Scheme

30. In late spring – early summer 2015, SteelHouse induced a long-standing Criteo client, TOMS Shoes ("TOMS"), to perform a head-to-head comparison of Criteo's and SteelHouse's products and services.

31. SteelHouse "won" the head-to-head comparison. As a result, TOMS believed that SteelHouse's products and services were superior to Criteo's products and services, initially reduced its advertising budget spend with Criteo, and then stopped using Criteo altogether. TOMS did not know at the time that SteelHouse "won" the head-to-head by counterfeiting clicks.

32. In November 2015, Criteo convinced TOMS to run a second head-to-head comparison, which took place between November 2015 and January 2016. SteelHouse again appeared to outperform Criteo in the head-to-head. TOMS and Criteo did not know at the time that SteelHouse continued to inflate its performance during the head-to-head by counterfeiting clicks.

CRITEO S.A.'S COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

33.     In January and February of 2016, after apparently being outperformed by SteelHouse in the second head-to-head, Criteo conducted a detailed and costly data log analysis looking for ways to improve Criteo's performance.

34.     Criteo's analysis revealed that during the head-to-head comparison a large number of clicks attributed to SteelHouse landed within seconds after clicks attributed to Criteo.  These clicks appeared to be fraudulent because it is highly unlikely that an internet shopper could click on an advertisement, be taken to an e-tailer's website, go to a different publisher's website, see a different advertisement for the same e-tailer placed by a different marketing vendor, and click on the second advertisement within seconds of having clicked on the first advertisement.

35.     In January 2016, Criteo presented its initial findings to TOMS, which had experienced decreased sales after switching to SteelHouse.  Upon receipt of this clarification, TOMS stopped using SteelHouse and continued to use only Criteo.

36.     Criteo then used Web traffic analysis software (*e.g.*, Telerik® Fiddler™) to learn how SteelHouse was generating the fraudulent clicks.  By investing substantial time and effort, Criteo learned that SteelHouse was effectively hijacking the internet traffic being routed between the advertiser and the browsers of the unsuspecting internet shoppers to counterfeit clicks with URL tracking parameters falsely identifying the source of the click as a SteelHouse-placed advertisement (*e.g.*, http://www.example.com/home.html?**utm_source=SteelHouse_x**&utm_ medium=display).

37.     SteelHouse's code counterfeits a click by building an iFrame on the underlying landing page, which then loads a new hidden copy of the e-tailer's website to which it attaches SteelHouse's tracking parameters.  This hidden copy of the e-tailer's webpage loads out of view of the internet shopper.  In addition, the URL tracking parameters that falsely identify SteelHouse as the source of the traffic never appear in the visible browser window of the internet shopper's address bar.  The iFrame has an automatic built-in timer that closes after ten seconds, erasing

CRITEO S.A.'S COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

1  evidence of SteelHouse's code as it closes.

2      38.    Because SteelHouse's counterfeit clicks occur after the valid clicks that
3  actually brought the internet shoppers to the e-tailers' websites, e-tailers are tricked
4  into attributing credit for subsequent sales to SteelHouse.

5      39.    Over the next couple of months, Criteo expanded its analysis of
6  webserver and internal logs to determine the scope of SteelHouse's counterfeit click
7  fraud scheme and was able to capture SteelHouse counterfeiting clicks on video and
8  with screenshots.

9      40.    Criteo's expanded analysis of webserver and internal logs revealed that
10 SteelHouse's counterfeit click fraud scheme: (a) was not limited to TOMS; it
11 extended across a wide array of Criteo's clients, primarily in the United States;
12 (b) extended to other online marketing vendors, like Google, Facebook, Bing,
13 Twitter and Pinterest; and (c) dated back to at least May 2015.

14     41.    Criteo lost a large client ("Client A") as a direct result of SteelHouse's
15 counterfeit click fraud scheme.  Other clients have reduced their advertising spend
16 with Criteo as a direct result of SteelHouse's counterfeit click fraud.

17     42.    Criteo, and its clients, were deceived by SteelHouse's counterfeit click
18 fraud scheme.

19     **SteelHouse Attempted To Hide Its Fraud When Confronted By Criteo**

20     43.    On April 6, 2016, Criteo's Chief Revenue Officer ("Criteo's CRO")
21 sent an email to SteelHouse's Chief Marketing Officer stating that Criteo was aware
22 of SteelHouse's fraudulent activity and "was open to hearing what [SteelHouse's]
23 CEO intends to do to immediately remedy this situation."

24     44.    On April 7, 2016, another Criteo employee contacted a SteelHouse
25 board member/investor to alert him of Criteo's April 6 email and request that he
26 discuss the suspicious activity with SteelHouse's Chief Executive Officer.

27     45.    Later in the day on April 7, SteelHouse's Chief Marketing Officer
28 replied to Criteo's CRO's April 6 email, offering to meet in person in New York the

following week to discuss the situation.

46. On April 12, 2016, Criteo's CRO met in person in Criteo's New York office with SteelHouse's Chief Marketing Officer and Chief Monetization Officer. A member of Criteo's Business Intelligence team attended the meeting by phone. Despite Criteo's requests that SteelHouse's CEO participate in the meeting, he did not attend either in person or by phone. Criteo's CRO explained what Criteo had discovered and asked that the fraudulent conduct stop because it was harming Criteo, e-tailers, and the advertisement technology industry as a whole. SteelHouse's executives claimed no knowledge of their company's activity, and stated that they would investigate it upon return to their California office.

47. On April 14, 2016, SteelHouse's Chief Marketing Officer asked Criteo's CRO to share as much as possible about Criteo's findings to help SteelHouse understand the issue and how to remedy it.

48. On April 18, 2016, Criteo provided SteelHouse the requested information by sending SteelHouse's Chief Marketing Officer log files that showed SteelHouse sending counterfeit clicks to two of Criteo's clients after the clients received valid clicks attributable to Criteo. SteelHouse confirmed it received the log files and told Criteo it was investigating the issue.

49. On April 26, 2016, SteelHouse's Chief Monetization Officer sent Criteo an email stating: "Thanks for sending the logs as well as the detailed breakout below. *We are acting on the data below over the next couple of days to remove the behavior.*"

50. On April 30, 2016, SteelHouse's Chief Monetization Officer sent Criteo an email stating that SteelHouse's engineering team was working to fix the issue and that it projected the issue would be fixed on May 5, 2016.

51. On May 1, 2016, Criteo's CRO spoke with SteelHouse's Chief Marketing Officer about Criteo's need to inform its clients about SteelHouse's conduct. Criteo agreed to send SteelHouse a draft statement to review before it went

CRITEO S.A.'S COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

1  to Criteo's clients and accepted edits subsequently proposed by SteelHouse before

2  sending it to Criteo's clients.

3  52.     On May 6, 2016, SteelHouse's Chief Monetization Office informed

4  Criteo that SteelHouse had implemented "global" code changes that would fix the

5  issue.  Criteo's account management team then began notifying impacted e-tailers of

6  the issue.

7  53.     Criteo subsequently learned that SteelHouse was making false

8  statements to e-tailers in an attempt to minimize its misconduct.  For example,

9  notwithstanding the fact that SteelHouse was intentionally counterfeiting clicks to

10 steal credit for sales attributable to both its competitors and sources of direct traffic,

11 and that its misconduct involved numerous e-tailers, SteelHouse claimed:

12
13
14
15
16

> The email you received from Criteo is referring to a
> SteelHouse tracking pixel that was conflicting with their
> tracking pixel.  The issue impacted less than 4% of click
> based conversions, and was resolved on May 6th, soon
> after we were notified and found the discrepancy.
> Additionally, the technical glitch only impacted a small
> portion of E-tailers that were running Criteo and
> SteelHouse campaigns at the same time.

17 54.     SteelHouse's claim was false because its counterfeit click fraud was not

18 limited to 4% of click-based conversion, was not resolved on May 6, 2016, and was

19 not limited to e-tailers running both Criteo and SteelHouse campaigns at the same

20 time.

21 55.     Notwithstanding the fact that SteelHouse was intentionally

22 counterfeiting clicks, SteelHouse told other e-tailers that its "Discrepancy Minimizer

23 Tool" was the source of any data discrepancy.  This excuse is false because

24 SteelHouse tailored the code it used to counterfeit clicks to work with the different

25 tracking parameters used by the e-tailers from which it was trying to steal credit.

26 Criteo asked SteelHouse what its "Discrepancy Minimizer Tool" was, but received

27 no response.

28 56.     On May 12, 2016, Criteo's and SteelHouse's executives communicated

CRITEO S.A.'S COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

1 by conference call. Criteo's CRO explained that it was clear from SteelHouse's

2 continued efforts to mislead e-tailers that SteelHouse was not acting in good faith to

3 stop its counterfeit click fraud conduct. Criteo asked SteelHouse to verify the date

4 that its counterfeiting code went live, and SteelHouse did not respond. After

5 additional questions by Criteo, SteelHouse stated that its "global" code change meant

6 to correct the conduct went live on May 6, 2016. However, SteelHouse told Criteo

7 that it should determine on its own the date the counterfeit click fraud conduct began.

8      57.   Between May 9, 2016 and May 13, 2016, after SteelHouse instituted its

9 purported "global" change to stop its wrongful conduct, Criteo closely monitored an

10 ongoing head-to-head comparison of Criteo and SteelHouse by another client

11 ("Client B"). Criteo discovered that SteelHouse was still utilizing counterfeit clicks

12 to cheat on the head-to-head competition. This time, SteelHouse was using

13 counterfeit clicks to steal transactions attributable to direct traffic, which made

14 SteelHouse's fraud more difficult to detect. By using different code to steal direct

15 traffic attribution, SteelHouse once again falsely appeared to beat Criteo in Client

16 B's head-to-head comparison.

17      58.   On May 23, 2016, Criteo sent a cease-and-desist letter to SteelHouse

18 executives calling on them to immediately stop SteelHouse's counterfeit click fraud

19 scheme.

20      59.   On June 9, 2016, despite SteelHouse's claims that its unlawful conduct

21 had ceased, Criteo discovered that SteelHouse was still counterfeiting clicks. This

22 Complaint followed.

## **FIRST CLAIM FOR RELIEF**

### **(Violations of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) (False and/or Misleading Advertising))**

26      60.   Criteo hereby adopts and incorporates by reference each of the

27 allegations contained in paragraphs 1 through 59 above, as though set forth in full

28 herein.

11

CRITEO S.A.'S COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

61.     SteelHouse violated Section 43(a) of the Lanham Act, which prohibits false and misleading advertising.

62.     SteelHouse made false and misleading statements of fact in commercial advertisements about the nature, quality, and characteristics of both its products and services and Criteo's products and services, including that SteelHouse consistently beat Criteo in head-to-head comparisons.

63.     The above-referenced statements were false because SteelHouse did not outperform Criteo in head-to-head comparisons; it only appeared to do so because SteelHouse used counterfeit clicks to steal credit for sales attributable to Criteo and to take credit for clicks that were the result of direct traffic.

64.     SteelHouse's false statements as to the relative performance of SteelHouse and Criteo in head-to-head testing actually deceived or had a tendency to deceive a substantial segment of SteelHouse's potential customers.  In fact, as a result of SteelHouse's false statements, existing and potential Criteo customers made business and purchasing decisions based on the false belief that SteelHouse actually outperformed Criteo in head-to-head comparisons.

65.     SteelHouse's deception was likely to influence the purchasing decisions of e-tailers because it went to the core of performance based marketing, *i.e.*, performance.

66.     SteelHouse caused its false statements to enter interstate commerce because its products and services are advertised and sold across state lines through the internet.  SteelHouse, which is incorporated in California and has its principal place of business in California, advertised and sold its products and services to e-tail clients throughout the United States.

67.     SteelHouse's false statements have had a substantial effect on Criteo's business and have injured Criteo.  As a result of SteelHouse's false statements, Criteo has lost business, had revenue diverted from itself to SteelHouse, and has been forced to expend time and money both investigating and responding to

SteelHouse's false claims. Criteo has suffered and will continue to suffer substantial injury and damage to its business, goodwill, reputation and profits in an amount to be proven at trial.

## SECOND CLAIM FOR RELIEF

### (Fraud)

68.     Criteo hereby adopts and incorporates by reference each of the allegations contained in paragraphs 1 through 67 above, as though set forth in full herein.

69.     Since at least May 2015, SteelHouse has made thousands of material misrepresentations of fact to e-tail clients and to Criteo. SteelHouse counterfeited clicks and continues to counterfeit clicks that include tracking codes that represent to Criteo and its e-tail clients that internet shoppers clicked on a SteelHouse-placed advertisement after the internet shopper clicked on a Criteo-placed advertisement.

70.     These representations are false because the internet shoppers associated with these counterfeit clicks did not see, much less click on, a SteelHouse-placed advertisement.

71.     SteelHouse knew these representations were false because it counterfeited the associated clicks and, therefore, knew the associated internet shoppers never saw, much less clicked on, a SteelHouse placed advertisement.

72.     SteelHouse knew or should have known that its counterfeit clicks would be received by Criteo by way of a cookie placed on the internet shoppers' web browsers, as well as through e-tailers during head-to-head comparisons.

73.     SteelHouse intended Criteo and its e-tail clients to rely on its misrepresentations. In fact, SteelHouse counterfeited clicks for the express purpose of stealing attribution for sales attributable to Criteo. SteelHouse intended or reasonably expected that its misrepresentations would be relied upon by Criteo for determining attribution performance, particularly in the context of head-to-head comparisons between SteelHouse and Criteo. SteelHouse also intended that Criteo

1  and its e-tail clients would rely on its counterfeit clicks and false tracking codes

2  when attributing sales and establishing marketing budgets.

3  74. Both Criteo and its e-tail clients reasonably and justifiably relied upon

4  SteelHouse's representations. They did not know that SteelHouse was counterfeiting

5  clicks, and tracking codes are commonly relied on in the industry when attributing

6  sales.

7  75. SteelHouse's misrepresentations were material because they resulted

8  in: (a) e-tailers attributing sales to SteelHouse that should have been attributed to

9  Criteo or to direct traffic; (b) SteelHouse's conversion rate and the ROAS of its

10  clients being artificially inflated; and (c) Criteo's conversion rate and the ROAS of

11  its clients being artificially suppressed.

12  76. Criteo was harmed by SteelHouse's misrepresentations because Criteo

13  lost attributions for sales that should have been attributed to it, lost clients and

14  potential clients, had its marketing budgets reduced, and has diverted, and continues

15  to divert, substantial corporate resources investigating and responding to

16  SteelHouse's counterfeit click fraud scheme.

17  77. SteelHouse's officers both authorized and ratified SteelHouse's fraud.

18  Criteo is, therefore, entitled to both actual and punitive damages.

19  **THIRD CLAIM FOR RELIEF**

20  **(Intentional Interference With Prospective Economic Advantage)**

21  78. Criteo hereby adopts and incorporates by reference each of the

22  allegations contained in paragraphs 1 through 77 above, as though set forth in full

23  herein.

24  79. Criteo maintained continuing economic relationships with numerous

25  e-tailers, including, but not limited to, TOMS and Clients A and B, among others,

26  that probably would have continued to result in an economic benefit to Criteo.

27  80. SteelHouse knew about Criteo's economic relationships with these

28  e-tailers.

CRITEO S.A.'S COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

81.     SteelHouse intended to disrupt these relationships.  SteelHouse sent counterfeit clicks to these e-tailers to steal credit for sales attributable to Criteo and to artificially suppress Criteo's conversion rate and the ROAS of its clients.  As a result, Criteo's clients either stopped contracting with Criteo or decreased their advertising budget with Criteo, and potential clients were dissuaded from signing on with Criteo.

82.     SteelHouse intentionally engaged in wrongful acts designed to disrupt and damage Criteo's prospective economic relationships with its clients. As set forth in this Complaint, SteelHouse counterfeited clicks to steal credit for clicks attributable to Criteo, thereby committing fraud, libel, and trade libel, violating 18 U.S.C. § 1343 (Wire Fraud), and engaging in false advertising.

83.     SteelHouse's wrongful conduct actually disrupted Criteo's economic relationships with e-tailers, including, but not limited to, TOMS and Clients A and B, among others.

84.     Criteo was harmed by SteelHouse's interference with its economic relationships.  In fact, SteelHouse's conduct was a substantial factor in causing Criteo to suffer substantial injury and damage to its business, goodwill, reputation and profits in an amount to be proven at trial.

85.     SteelHouse's interference with Criteo's economic relations was willful, oppressive, fraudulent, and malicious, and was authorized and ratified by SteelHouse's officers.  Criteo is, therefore, entitled to both actual and punitive damages.

## FOURTH CLAIM FOR RELIEF

### (Libel – California Civil Code § 45)

86.     Criteo hereby adopts and incorporates by reference each of the allegations contained in paragraphs 1 through 85 above, as though set forth in full herein.

87.     In its email advertisements to Criteo's clients and potential clients,

CRITEO S.A.'S COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

SteelHouse represented that SteelHouse's products and services consistently outperformed Criteo's products and services in head-to-head comparisons. These representations were false. Criteo's products and services consistently performed better than SteelHouse's products and services in head-to-head comparisons. SteelHouse's products and services only appeared to perform better because of SteelHouse's counterfeit click fraud scheme.

88.     SteelHouse published these statements of false superiority to multiple third parties, including Criteo's clients and potential clients.

89.     SteelHouse made these false statements with actual knowledge of their falsity. SteelHouse, therefore, acted with actual malice, or, at the very least, did not use reasonable care in determining their truth or falsity. SteelHouse knew its statements were false because it used counterfeit clicks to cheat during the head-to-head comparisons. Accordingly, SteelHouse knew that its products and services had not actually outperformed Criteo's products and services, and that SteelHouse's products and services only appeared to outperform Criteo's products and services because of SteelHouse's illegal and fraudulent scheme.

90.     SteelHouse's statements were libelous on their face, and therefore libelous per se, as any reasonable person reading SteelHouse's statements would believe that Criteo offered substandard products and services that were inferior to SteelHouse's products and services. SteelHouse's libelous statements harmed and defamed Criteo's overall business reputation, in violation of California Civil Code § 45.

91.     SteelHouse's libelous statements caused Criteo special damages in the form of lost clients, lost advertising budgets and loss of potential clients. SteelHouse's libelous statements also caused severe and ongoing harm to Criteo's goodwill and damage to its reputation. Criteo seeks such special and actual damages as it may properly prove at trial, as well as exemplary and punitive damages in an amount sufficient to punish SteelHouse for its willful, malicious and intentional

wrongful conduct.

## FIFTH CLAIM FOR RELIEF

### (Trade Libel)

92.     Criteo hereby adopts and incorporates by reference each of the allegations contained in paragraphs 1 through 91 above, as though set forth in full herein.

93.     SteelHouse made false and libelous statements, with actual malice, in its advertisements to Criteo's clients and potential clients that disparaged the quality of one of Criteo's core products: its retargeting software.

94.     SteelHouse falsely claimed that Criteo's retargeting software was inferior to SteelHouse's advertising software, and that SteelHouse's software had consistently outperformed Criteo's advertising software in head-to-head comparisons.  In fact, SteelHouse knew that its software had performed worse than Criteo's software in head-to-head comparisons, and that SteelHouse's software only appeared to perform better than Criteo's software because of SteelHouse's counterfeit click fraud scheme.

95.     SteelHouse's libelous statements about Criteo's retargeting software disparaged and damaged the commercial reputation of Criteo's most important product, causing Criteo special pecuniary damages.  Criteo lost clients and its retargeting software was disparaged in the eyes of clients and potential clients as a result of SteelHouse's libel, costing Criteo lost revenue.

96.     SteelHouse's libelous statements also caused severe and ongoing harm to Criteo's goodwill and damage to its retargeting software's reputation.  Criteo seeks special and actual damages in amounts to be proven at trial, as well as exemplary and punitive damages in an amount sufficient to punish SteelHouse for its willful and intentional wrongful conduct.

CRITEO S.A.'S COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

## SIXTH CLAIM FOR RELIEF

**(Violation of California Business & Professions Code § 17200 *et seq.* (Unfair Competition Law))**

97.     Criteo hereby adopts and incorporates by reference each of the allegations contained in paragraphs 1 through 96 above, as though set forth in full herein.

98.     SteelHouse has committed one or more acts of unfair competition within the meaning of California Business & Professions Code § 17200 *et seq.* ("UCL"). SteelHouse's acts and practices constitute unlawful and/or fraudulent business acts and practices within the meaning of the UCL, including, but not limited to, counterfeiting clicks with URL tracking parameters that falsely identify SteelHouse as the source of the click.

99.     SteelHouse's acts and practices are "unlawful" because they violate section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), California Business & Professions Code Sections 17500 *et seq.*, and constitute fraud; intentional interference with prospective economic advantage, libel, and trade libel as set forth above and below.

100.     SteelHouse's acts and practices are also unlawful because they violate the federal wire fraud statute, 18 U.S.C. § 1343.

101.     As explained above, SteelHouse devised a scheme or artifice to defraud and obtain money by means of false or fraudulent pretenses, representations, and promises.

102.     In furtherance of and for the purpose of executing its fraudulent scheme, SteelHouse used the wires of the United States in interstate commerce. SteelHouse employed its counterfeit click fraud scheme through the internet and by email, and targeted e-tailers in multiple states and various nations outside the United States.

103.     SteelHouse engaged in its counterfeit click fraud scheme with the specific intent to deceive and defraud Criteo and e-tailers.

104.   SteelHouse's business practice of fraudulently stealing attribution for sales to inflate its performance metrics violated 18 U.S.C. § 1343, which prohibits wire fraud, and by extension the Unfair Competition Law.

105.   SteelHouse's acts and practices are also "fraudulent" within the meaning of the UCL because they are likely to deceive members of the public.

106.   SteelHouse knew, or should have known through the exercise of reasonable care, that the counterfeit clicks and advertising and marketing statements challenged herein were false and/or misleading.

107.   Criteo has suffered injury in fact and lost money as a result of SteelHouse's unlawful acts, omissions, and practices and has been irreparably harmed and will continue to suffer irreparable harm by reason of these violations.

## SEVENTH CLAIM FOR RELIEF

**(Violations of California Business & Professions Code § 17500 *et seq*.**
**(False Advertising Law))**

108.   Criteo hereby adopts and incorporates by reference each of the allegations contained in paragraphs 1 through 107 above, as though set forth in full herein.

109.   SteelHouse committed acts of false and misleading advertising within the meaning of California Business & Professions Code § 17500 *et seq.* because the aforementioned counterfeit clicks and oral and written representations are, by their nature, unfair, deceptive, untrue or misleading advertising within the meaning of the statute.  SteelHouse's aforementioned advertisements promote to Criteo's and SteelHouse's clients and potential clients material aspects of service with false and misleading statements.

110.   SteelHouse knew, or should have known, through the exercise of reasonable care, that the above-described advertising and marketing statements challenged herein were false and/or misleading.

111.   Criteo's actions in violation of § 17500 were false and/or misleading in

CRITEO S.A.'S COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

material respects such that the intended recipients were likely to be deceived, including Criteo, Criteo's clients and potential clients, and SteelHouse's clients and potential clients.

112.   SteelHouse's principal place of business is in California and thus the untrue or misleading advertisements were made or disseminated in California.

113.   Criteo has suffered an injury in fact and lost money as a result of SteelHouse's unlawful acts, omissions, and practices and has been irreparably harmed and will continue to suffer irreparable harm by reason of these violations.

**REQUEST FOR RELIEF**

WHEREFORE, Criteo prays that judgment be entered in its favor and against SteelHouse, as follows:

1.   A preliminary injunction and permanent injunction enjoining and restraining SteelHouse, its officers, agents, servants, employees, attorneys, and other persons who are in active concert or participation with them during the pendency of this action and thereafter perpetually from:

a.   counterfeiting clicks,

b.   interfering with, or manipulating, by any means, the proper attribution of online sales,

c.   engaging in any other conduct designed to artificially inflate or artificially suppress performance metrics, and

d.   falsely advertising that SteelHouse consistently outperformed Criteo in head-to-head comparisons;

2.   An award to Criteo of monetary relief, including, but not limited to, actual damages, compensatory damages, punitive damages, and restitution, as permitted by law in amounts to be determined at trial;

3.   An award to Criteo of prejudgment and post-judgment interest;

4.   An award to Criteo for its costs of suit, expenses and reasonable attorney's fees, as permitted by law; and

1      5.      Such other relief as the Court may deem just and proper.

2                              **<u>JURY TRIAL DEMAND</u>**

3      Criteo hereby demands a jury trial on all claims and issues triable to a jury.

4

5   DATED:  June 13, 2016      SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP

6                              By:_____*/s/ Jack P. DiCanio*_____

7                                        JACK P. DICANIO
                                         JAMES P. SCHAEFER

8                                        ABRAHAM A. TABAIE
                                         Attorneys for Plaintiff

9                                        Criteo S.A.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CRITEO S.A.'S COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF