JACK P. DICANIO (SBN 138782)
Jack.DiCanio@skadden.com
JAMES P. SCHAEFER (SBN 250417)
James.Schaefer@skadden.com
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
525 University Avenue, Suite 1400
Palo Alto, California 94301
Telephone:  (650) 470-4500
Facsimile:   (650) 470-4570

ABRAHAM A. TABAIE (SBN 260727)
Abraham.Tabaie@skadden.com
MATTHEW J. TAKO (SBN 307013)
Matthew.Tako@skadden.com
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
300 South Grand Avenue, Suite 3400
Los Angeles, California 90071-3144
Telephone:  (213) 687-5000
Facsimile:   (213) 687-5600

Attorneys for Plaintiff Criteo S.A.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| CRITEO S.A., <br><br> Plaintiff, <br><br> v. <br><br> STEEL HOUSE, INC., <br><br> Defendant. | CASE NO.: 2:16-cv-4207-SVW-MRW <br><br> DECLARATION OF JAYSEN GILLESPIE FILED IN SUPPORT OF PLAINTIFF CRITEO S.A.'S MOTION FOR PRELIMINARY INJUNCTION <br><br> Hearing Date: August 1, 2016 <br> Time:             1:30 p.m. <br> Courtroom:   6 <br> Judge:          Hon. Stephen V. Wilson <br><br> Complaint Filed: June 13, 2016 |

# DECLARATION OF JAYSEN GILLESPIE

I, Jaysen Gillespie, state and declare as follows:

1. I am currently employed as Vice President, Analytics, Insights, and Data Science at Criteo S.A. ("Criteo") and have performed substantially similar work under various titles since September 2012. I make this declaration based on my personal knowledge, except where I have indicated otherwise. If called as a witness, I could and would testify competently and truthfully to these matters.

2. I hold a Bachelor of Science in Engineering, focused on electrical engineering and computer science, from Duke University and a Master of Science in engineering-economic systems and operations research from Stanford University.

3. I have 18 years of data analysis experience, and have worked at DraftFCB (now FCB), DMS Marketing, Carlson Restaurants Worldwide, and Catalina Restaurant Group, among others, overseeing detailed analysis of large datasets, deriving important insights via such analysis, and linking those insights to business implications, work similar to the data analysis I did here.

4. DraftFCB (FCB) and DMS Marketing are advertising agencies where my role was to deliver performance marketing for a range of clients. At both of these jobs, this charge involved serving as the lead analytical resource addressing client issues, where I reported to the Chief Analytics Officer and Chief Executive Officer, respectively. The work involved understanding datasets that covered millions of users, developing reporting and analytics that "told the story" regarding the performance of digital marketing, and addressing the topic of transaction and lead attribution in online systems.

5. Carlson Restaurants Worldwide and Catalina Restaurant Group own chains of full-service and fast casual dining concepts which serve millions of guests each year. My role at both companies involved working with vast datasets to determine insights into consumer behavior and to couple those insights with the digital and non-digital marketing analytics I developed. I spent substantial time

1

gaining expertise in marketing measurement, both digital and non-digital, in order to accurately answer the questions, "What impact is my marketing having?" and, "How do I create a data-driven case to defend or refute assertions from external vendors regarding the performance of marketing solutions?"

6. I have a special designation called a "Kaggle Master," which kaggle.com uses to identify the top data scientists in its global community. Kaggle.com is an online service which unites the top data scientists globally to participate in predictive modeling and data analysis contests, many of which involve considerable cash prizes for the winners. I have also held the rank of #50 (of 575,795 community members) in Kaggle.com's global ranking of data scientists.

7. From September 2012 to January 2016, I led and managed all client-facing, market-facing, and internal analytics efforts for Criteo's North American market. Starting in January 2016, I also combined market-facing duties with insights and strategic work. My work includes understanding predictive modeling methods, recommendation engine algorithms, online real-time advertising models, advertiser competition strategy, attribution model analysis, and trafficking/campaign setup and management.

8. I serve as a primary analytical link to our Paris-based research and development team, and I also work with Criteo's Global Analytics team to develop our analytical tools and methods.

9. I also have experience presenting key analytical information about account performance, such as ROAS, conversion rate, and attributed order value, on major accounts as part of the extensive client contact associated with my position. In addition, I regularly attend new client pitch meetings to lend my knowledge of Criteo's performance.

10. As a result of my duties and responsibilities at Criteo, I have strong knowledge of Criteo's underlying retargeting engine and business models.

11. Since January 2016, various employees in Criteo's Global Analytics

team and I have been heavily involved in analyzing Criteo's and Steel House, Inc.'s ("SteelHouse") relative performances during head-to-head comparisons by e-tail clients. During that analysis, I discovered that SteelHouse is counterfeiting clicks to steal credit for sales attributable to other sources (e.g., search, direct traffic, and competing marketing vendors), including credit for sales attributable to Criteo.

12. Criteo and SteelHouse are performance-based online marketing vendors.

13. Criteo and SteelHouse directly compete for e-tail clients.

14. Performance-based marketing vendors work with e-tailers to help them increase traffic to their websites and convert potential customers into customers.

15. Performance-based online marketing works because e-tailers can track the source of traffic to their websites and attribute subsequent sales to the marketing vendor responsible for that traffic.

16. Because e-tailers often contract with multiple marketing vendors at the same time, they need a means to track which marketing vendor placed the advertisement clicked on by the potential customer. This is accomplished by adding tracking codes to the Uniform Resource Locators ("URLs") used to take potential customers who click on an online advertisement to the e-tailers' websites. A URL is an address on the internet, such as http://www.example.com, which enables computers and other devices to visit it. The bolded code in the following example is a tracking code: http://www.example.com/home.html?**utm_source=SteelHouse_x**&utm_medium=display. A utm_source with a parameter set to hold the value "**SteelHouse_x**," for example, would clearly indicate that a visitor to an e-tail website arrived by clicking on a SteelHouse ad. Therefore, anyone viewing this tracking code could determine that the traffic came from SteelHouse. Likewise, if the tracking code was "**Criteo_x**," anyone viewing this tracking code could determine that the traffic came from Criteo.

17. To determine which marketing vendor should receive attribution, or "credit," for a sale when an internet shopper has clicked on advertisements placed by more than one marketing vendor before the sale, e-tailers use various attribution models. An "attribution model" is a rule, or set of rules, that determines when a marketing vendor or direct traffic receives credit for a purchase made by an internet shopper. This credit is allocated either to direct traffic activity or through the clicking of an ad placed by a marketing vendor.

18. The majority of Criteo e-tail clients use Last-Click Attribution to attribute credit to the corresponding source of traffic (*e.g.*, search engines, direct traffic, online ads). Such attribution rules assign credit among competing marketing vendors.

19. Last-Click Attribution is a web analytics model in which the source of the "last click" before a sale is given credit for the sale. Web analytics systems such as Google Analytics™, Adobe® Analytics, and IBM® Coremetrics®, among others, can track and measure attribution and marketing vendor performance in this manner.

20. Retargeting – a form of performance-based online marketing – is a cookie-based technology that allows marketing vendors to serve ads targeted to potential customers as they browse the internet, based on their past browsing history. Retargeting works as follows. When a potential customer visits an e-tailer's website, a cookie is dropped on the potential customer's web browser that indicates he or she visited the e-tailer's website. Later, when the potential customer browses the internet, publishers of other websites see the cookie and, if they have advertising space available, offer the associated e-tailer's marketing vendors the opportunity to purchase that advertising space. If the marketing vendor determines that the price of the advertising affords it the opportunity to make a profit, it purchases the space and serves a targeted advertisement for the associated e-tailer. Retargeting is effective because it focuses the e-tailer's advertising spend on people who have already

demonstrated an interest in the e-tailer's products or services through prior visits to the e-tailer's website.

21. As is the case with many marketing vendors, Criteo uses a Pay-Per-Click, also called Cost-Per-Click ("CPC"), pricing model. Under this model, Criteo only generates revenue when internet shoppers click on the advertisements that Criteo places for its clients.

22. The amount that Criteo can charge its clients per click depends on its performance, as measured by its post-click de-duplicated conversion rate and the ROAS of its clients. Criteo's "post-click de-duplicated conversion rate" is based on only those transactions where a Criteo click was the last-click in the e-tail client's web analytic system. Both Criteo's de-duplicated conversion rate and the ROAS of its e-tail clients depend, in large part, on the proper attribution of sales to Criteo.

23. The market for performance-based online marketing is highly competitive, complex, and fragmented. Criteo's competitors include, among others, Google, Facebook, AdRoll, Sociomantic, and SteelHouse.

24. Every day Criteo is presented with billions of opportunities to connect individuals that are browsing the internet with relevant marketing messages from Criteo's clients. For each of these opportunities, Criteo's algorithms analyze massive volumes of data to observe and predict user intent and deliver specific messaging for products or services that are likely to engage that particular user and result in a sale for Criteo's clients. Last year, Criteo delivered targeted advertisements that generated billions of clicks. Based on these clicks, Criteo's clients generated approximately $21 billion in post-click sales.

25. Criteo's ability to earn the business of prospective clients and retain the business of existing clients is directly related to its performance, as measured by its conversion rate and the ROAS of its clients.

26. I have been informed by others at Criteo that: (a) in late spring to early summer 2015, SteelHouse induced a Criteo client, TOMS Shoes ("TOMS"), to

5

perform a head-to-head comparison of Criteo's and SteelHouse's products and services; (b) SteelHouse "won" this head-to-head comparison; and, (c) as a result, TOMS initially reduced its advertising budget spend with Criteo, and then stopped using Criteo altogether.

27. In November 2015, Criteo convinced TOMS to run a second head-to-head comparison, which took place between November 2015 and January 2016. SteelHouse again appeared to outperform Criteo in the head-to-head comparison.

28. In January and February of 2016, after apparently being outperformed by SteelHouse in the second head-to-head, Criteo's Global Analytics team and I conducted a detailed and costly data log analysis looking for ways to improve Criteo's performance.

29. The Global Analytics team and I spent days analyzing the data log files themselves. Our analysis revealed that, during the head-to-head comparisons, there were a large number of clicks attributed to SteelHouse that landed seconds after clicks attributed to Criteo. Because the fraction of clicks that arrived immediately after a prior site event[1] was so high, these clicks were interpreted to be fraudulent. This is because it is highly unusual for an internet shopper to (1) click on an advertisement and be taken to an e-tailer's website, then, almost instantaneously, (2) go to a different publisher's website, see a different advertisement for the same e-tailer placed by a different marketing vendor, and click on that second advertisement; again, within seconds of having clicked on the first advertisement. Basically, we determined that it would be a rare occurrence to be able to click on the second advertisement on a different site within seconds of having clicked on the first advertisement.

---

[1] As relevant here, a prior site event could be generated either (1) by the user clicking on an ad for the e-tailer placed by Criteo or another marketing vendor, redirecting the user to the e-tailer's site, or (2) by the user navigating directly to the e-tailer's site by typing the e-tailers website into a browser.

30. Our analysis was possible because each time an internet user visits an e-tail client's website, Criteo records a number of pieces of information about the browsing behavior on the e-tail website of that internet user. A small piece of Criteo code, called a "JavaScript tag," executes in order to record this information. In the case of the TOMS head-to-head comparison of SteelHouse and Criteo, Criteo's JavaScript tags fire unconditionally, which means that all user behavior, including behavior from users driven to the TOMS website from both Criteo marketing and SteelHouse marketing, is logged in Criteo's data logs. SteelHouse also utilizes a JavaScript tag for the same reason: to transmit information about any internet user's browsing behavior back to SteelHouse servers. An e-tailer, like TOMS, may choose to install JavaScript tags from dozens of third party companies to use the third party's products and services. For example, here, TOMS installed a JavaScript tag from Google Analytics in order to pass relevant data regarding sources of internet traffic to the Google Analytics system TOMS uses to assign credit for each transaction.

31. Criteo's data logs capture, among other things, the full URL of the page including any tracking code. This allows Criteo to determine if a landed click is sourced from SteelHouse, Criteo, or another marketing vendor.

32. The items stored in the Criteo data logs related to TOMS are standard fields that are stored for all Criteo clients. A unique ID for each Criteo client ("Criteo Client ID") and each website user ("Criteo Cookie ID") allows Criteo to accurately separate data related to TOMS, or any other client, for analysis purposes.

33. TOMS was using the utm_medium parameter in order to determine which marketing vendor generated the traffic delivered to the TOMS website.

34. Criteo's Global Analytics and I were able to pull a detailed log of all site events on TOMS, including the Criteo Cookie ID, the timestamp (in seconds) of the site event, the URL of the landing page, and the utm_medium tracking codes (if any) attached to the event.

35. Once this clean, normalized data was obtained, we were able to calculate the gap in time between the landing of a click from Criteo and a landing of a subsequent click from SteelHouse for the same user (because each event is timestamped in our logs).

36. An abbreviated version of raw site event data logs from Criteo's datastore is pasted below. The check mark indicates the two rows from the same user. The highlighted number is a standard Unix timestamp, representing the number of seconds from Jan 1, 1970, and the utm_medium tracking parameter is seen first with =criteo and then with =steelhouse. The =steelhouse portion of the URL tells the web analytics system to credit any subsequent transactions for that user to SteelHouse, as the "click" from SteelHouse arrived 4 seconds after the click from Criteo.

```
4dfdc496-c2bb-4acb-8e0d-5c23840d834d      0        1451782344    NULL    utm_medium=criteo&utm_campaign=lowerfunnel
eo&utm_campaign=lowerfunnel    Mozilla/5.0 (Windows NT 10.0; WOW64) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/47.
630091cc-4b66-4d26-9f5a-66e5972ba497      0        1451782365    NULL    utm_medium=steelhouse&utm_campaign=12views
dium=steelhouse&utm_campaign=12views    Mozilla/5.0 (Windows NT 6.1; WOW64; Trident/7.0; rv:11.0) like Gecko    ie
51cbba35-eb6f-415a-ac8f-a3fdb0cfaa00  ✓   0        1451782372    NULL    utm_medium=criteo&utm_campaign=lowerfunnel
eo&utm_campaign=lowerfunnel    Mozilla/5.0 (Linux; Android 5.1.1; SAMSUNG-SM-G925A Build/LMY47X) AppleWebKit/537.36 (
6        chrome mobile    Android
51cbba35-eb6f-415a-ac8f-a3fdb0cfaa00  ✓   0        1451782376    NULL    utm_medium=steelhouse&utm_campaign=mobile
=steelhouse&utm_campaign=mobile Mozilla/5.0 (Linux; Android 5.1.1; SAMSUNG-SM-G925A Build/LMY47X) AppleWebKit/537.36 (
6        chrome mobile    Android
```

37. Because the size of the data related to TOMS' head-to-head comparison of Criteo and SteelHouse is large, we started our analysis with a one-day sample of results from a random day in January 2016. In this analysis, and all subsequent analyses, we remove a small number of outlier cookies (defined as those cookies with generally somewhere between 30 and 100 landed clicks) in order to remove IT test bots, web crawlers, and other non-human traffic.

38. We found 2320 landed clicks from SteelHouse on the day in question. We separated these landed clicks into two types: (1) clicks associated with users who did not have other landed clicks with a vendor's tracking code, and (2) clicks from users who did have other landed clicks with a vendor's tracking code.

39. We found 1449 landed clicks generated by users which did not have

another site event with a vendor tracking code in the URL, leaving 871 landed SteelHouse clicks where such clicks overlap with another tracking code. Of those 871 landed clicks, 769 of them represent landed clicks from SteelHouse where another distinct marketing vendor (as opposed to another click from SteelHouse) exist for the same user. The other 102 clicks represent landed clicks from SteelHouse where the prior landed click was also from SteelHouse.

40. Of the 769 landed clicks from SteelHouse where the user had also arrived on TOMS from another marketing vendor, we analyzed the gap in seconds between the prior landed click from another marketing vendor and the landed click from SteelHouse. The results are as follows:

    a. Gap of 1-2 seconds: 238 clicks
    b. Gap of 3-5 seconds: 250 clicks
    c. Gap of 6-10 seconds: 131 clicks
    d. Gap of more than 10 seconds: 150 clicks

41. We thus found that 80% of the SteelHouse landed clicks under analysis followed a different marketing vendor's landed click within 10 seconds.

42. To benchmark the above data against a "standard" distribution, we ran the same analysis for landed clicks from paid search (i.e., inbound clicks from marketing vendors such as Google or Bing) and from Criteo.

    a. We found that 2% of similarly defined landed clicks from Criteo occur within 10 seconds after another vendor's landed click.
    b. We found that 4% of similarly defined landed clicks from paid search occur within 10 seconds after another vendor's landed click.
    c. The relatively small fraction of clicks that land within a few seconds of an alternate vendor's landed click are likely edge cases caused by non-standard clicking behavior, such as a user browsing with multiple tabs open to multiple publisher websites where each publisher website displays marketing from different marketing vendors.

43. The following chart shows the comparison of landed click time delays after a prior vendor's landed click:



44. Given the high incidence of SteelHouse clicks which landed immediately after another vendor's landed clicks, we extended our analysis to include the full period of TOMS' head-to-head comparison of SteelHouse and Criteo.

45. We observed SteelHouse clicks occurring within 30 seconds both after another marketing vendor's landed clicks and after landed clicks from SteelHouse itself. SteelHouse clicks following other SteelHouse clicks have no effect on sales attribution in a last click web analytics system, as the last tracking code passed to the web server was already indicating SteelHouse as the source of traffic. However, the presence of these SteelHouse-following-SteelHouse clicks indicates evidence that some element of the SteelHouse code was triggered by the tracking parameter used by TOMS (i.e., utm_source) as opposed to a specific tracking parameter plus tracking code (e.g., such as utm_source=VendorX_1).

46. We found that from Nov 1, 2015 to Jan 31, 2016, SteelHouse generated 97,111 landed clicks on TOMS. Of those, we found that 19,680 (20.3%) landed within 30 seconds after a prior landed click from another marketing vendor.

47. In the same time frame, we found that Criteo generated 95,262 landed clicks on TOMS, but only 557 of those clicks (0.6%) landed within 30 seconds of a prior vendor's landed click. Paid search generated a vast number of landed clicks, but only 0.1% of those clicks landed within 30 seconds of another marketing vendor's landed click. The contrast between the data related to Criteo and paid search and the data related to SteelHouse indicated that SteelHouse was doing something unusual to transmit a click to the e-tailer's web analytic server after another vendor's landed click. Another Criteo employee, Hersh Anand, was tasked with determining what SteelHouse was doing to transmit a click to the e-tailer's web analytic server after another vendor's landed click.

48. We also determined that SteelHouse's click scheme was not only directed against Criteo but also against all other major sources of traffic, including paid search and links from client emails.

49. We found that when the prior landed click was from Criteo, then the subsequent SteelHouse click had a 79% chance of landing within 30 seconds of the click from Criteo. While SteelHouse's code created this situation following Criteo clicks, we also found that SteelHouse behaved similarly – but to a lesser extent – with respect to other sources of traffic.

//
//
//
//
//
//
//
//
//
//

50. The following chart shows the breakdown of landed clicks from SteelHouse that follow another vendor's landed click. The orange section of each vertical bar represents the SteelHouse clicks that landed within 30 seconds of the other vendor's click.



51. In a last-click web analytics system, it does not matter which types of landed click precede the last landed click. Thus, SteelHouse would gain last-click attribution for any subsequent sales by an internet shopper even if their landed click occurred seconds after a Criteo landed click, a click from paid search, or a click from a TOMS email.

52. Because SteelHouse's counterfeit clicks occur after the valid clicks that actually brought the internet shoppers to the e-tailers' websites, e-tailers using Last-Click Attribution are tricked into attributing credit for subsequent sales to SteelHouse. This additional attribution – to a click that never occurred – raises the perceived value of SteelHouse's marketing solution. By deploying this scheme during a head-to-head comparison, SteelHouse is more likely to win the comparison, thereby falsely advertising superior services. This type of false advertising results in e-tailers making marketing vendor and advertising spend decisions to the benefit of SteelHouse and to the detriment of Criteo and other marketing vendors.

53. In January 2016, Criteo presented its initial data findings to TOMS, which had relayed to me that it had experienced decreased sales after switching to SteelHouse. Upon being presented the data from our findings, TOMS stopped using SteelHouse and reverted back to using Criteo.

54. From early February until today, Criteo's Global Analytics team and I have continued to analyze data logs to determine the extent of SteelHouse's counterfeit click activity. We have determined that SteelHouse's counterfeit click scheme: (a) was not limited to TOMS, but extended across a wide array of Criteo's clients, primarily throughout the United States; (b) extended to other online marketing vendors, like Google, Facebook, Bing, Twitter and Pinterest; and (c) dated back to at least May 2015.

55. As our understanding of SteelHouse's behavior improved, we broadened our standard analysis to review in detail both landed clicks that follow another marketing vendor's landed click and landed clicks that follow a site event with no vendor tracking code. All subsequent analysis combines both types of approaches, as both SteelHouse strategies create the same end: increased attribution of subsequent sales for SteelHouse via the generation of fraudulent clicks.

56. For example, our analysis of data logs from the e-tailer Thrive Market shows that SteelHouse has generated a large portion of landed clicks that occur within 30 seconds of a prior site event.

57. Log file analysis indicated that SteelHouse provided 58,029 landed clicks over a four-month period for Thrive Market. Of those SteelHouse landed clicks, 21,781 (37.5%) landed within 30 seconds of another prior website event. During this same period, Criteo provided 72,093 landed clicks. Of those Criteo landed clicks, 535 (0.7%) landed within 30 seconds of another prior website event.

58. The chart below summarizes Criteo's analysis of the Thrive Market log files and demonstrates the different ways by which an internet shopper came to the Thrive Market website during the analysis period. The blue "Repeat" bar identifies

internet shoppers that clicked on a single marketing vendor's advertisement twice, either the same ad twice, or two different ads from the same marketing vendor, one after another. The grey "First Seen" bar identifies internet shoppers who arrived at the e-tailer's website via a marketing vendor and had not previously been to the website according to the data used in the analysis. The remaining colored bars represent landed clicks when that landed click came after a prior site event; different colors represent different amounts of time between the two site events.[2] The chart identifies this information for SteelHouse, Criteo and other vendors, such as Sailthru, Google, and vendors coded as affiliates. The following chart shows the distribution of the types of landed clicks for key vendors. The red section of each horizontal bar represents clicks that landed within 30 seconds of the prior site event.



59. In another example, our analysis of data logs from Criteo's e-tail client, Brilliant Earth, shows that SteelHouse has generated a large portion of landed clicks that occur within 30 seconds of a prior site event.

---

[2] For each of the charts below in my declaration, the colored bars have the same meaning.

60. Log file analysis indicated that SteelHouse provided 73,845 landed clicks over a two-month, one-week period for this e-tail client. Of those SteelHouse landed clicks, 35,530 (48.1%) landed within 30 seconds of the prior website event. During this same period, Criteo provided 275,192 landed clicks. Of those Criteo landed clicks, 1936 (0.7%) landed within 30 seconds of the prior website event.

61. TellApart engages in a substantially similar business as Criteo: driving performance via retargeting. TellApart delivered 26,599 landed clicks to Brilliant Earth. Of those TellApart landed clicks, 207 (0.8%) landed with 30 seconds of the prior website event.

62. The chart below summarizes Criteo's analysis of the Brilliant Earth log files and demonstrates the different ways by which an internet shopper came to the Brilliant Earth website during the analysis period. The chart identifies this information for SteelHouse vs. Criteo and other vendors, such as TellApart, Pinterest, and YieldMo. The following chart shows the distribution of the types of landed clicks for key vendors. The red section of each horizontal bar represents clicks that landed within 30 seconds of the prior site event.



63. Similarly, our analysis of data logs from another Criteo e-tail client, John Varvatos, shows that SteelHouse has generated many landed clicks that occur within 30 seconds of a prior website event.

64. Log file analysis indicated that SteelHouse provided 1,428 landed clicks over a two week period in 2016 for this client. Of those 1,428 SteelHouse landed clicks, 307 (21.5%) landed within 30 seconds of the prior website event. During this same period, Criteo was not used for performance marketing. Quantcast, a marketing company offering similar products and services to those of SteelHouse, generated 1,606 landed clicks during this same time period. Of those Quantcast landed clicks, 19 (1.2%) landed within 30 seconds of the prior website event.

65. The chart below summarizes Criteo's analysis of the John Varvatos log files and demonstrates the different ways by which an internet shopper came to the John Varvatos website during the analysis period. The chart identifies this information for SteelHouse vs. other vendors, such as Quantcast, Listrak, Facebook, and Bing.



66. Many visitors to e-tail websites arrive at such sites by directly navigating to the site, which could include typing the website's domain name (such

as "e-tailclient.com") into the URL of a browser or arriving via a bookmark stored in the browser. This internet commerce activity is referred to as direct traffic.

67. I undertook an analysis of website event data for another Criteo e-tail client, Nike, which was actively testing Criteo against SteelHouse in a head-to-head comparison to determine which vendor drove better performance, where performance was determined by last click sales attribution in the client's web analytics system.

68. Between May 9, 2016 and May 15, 2016 inclusive, Criteo's data logs found 48,141 landed clicks from SteelHouse. Of those, 30,052 (62%) arrived within 30 seconds of a prior website event.

69. During that same time period, we found that 3.7% of landed clicks from Criteo occurred within 30 seconds of a prior website event. For search traffic, this metric was 11.4%.

70. Detailed analysis of the website event preceding the landed click from SteelHouse for Nike showed that most prior website events were not events that included a tracking parameter from another marketing vendor. Such events were thus either direct traffic or events logged after a landed click from another vendor in the same website browsing session.

71. We found that 26,488 of the 30,052 SteelHouse counterfeit clicks followed a website event which did not send a tracking code to the Nike web server. As a result, any transaction made by these users were subsequently reattributed from either direct traffic or another vendor (via a prior tracking code) to SteelHouse. The following chart shows the distribution of the types of landed clicks for key vendors. The red section of each horizontal bar represents clicks that landed within 30 seconds of the prior site event.



72. Based on the above data, we discovered that SteelHouse was still utilizing counterfeit clicks to cheat on the head-to-head competition for Nike, after May 6, 2016. This time, SteelHouse was primarily using counterfeit clicks to steal transactions attributable to direct traffic, as opposed to firing counterfeit clicks directly after another marketing vendor's legitimate click. By using a different process to steal direct traffic attribution, SteelHouse once again falsely appeared to beat Criteo in the head-to-head comparison for Nike.

73. On June 9, 2016, despite SteelHouse's claims that its unlawful conduct had ceased, my team and I were able to detect that SteelHouse was still counterfeiting clicks, both after a landed click by another marketing vendor and after direct traffic.

74. So far, each and every time I have analyzed SteelHouse's click activity in log files relating to an e-tailer's data, the data has shown that SteelHouse has generated an unusually large portion of landed clicks that occur within 30 seconds of a prior website event.

//
//

I declare under penalty of perjury under the laws of the United States and the State of California that the foregoing is true and correct.

Executed on June 29, 2016 at Las Vegas, Nevada.

_____
Jaysen Gillespie